## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| **T.M., J.M.,** and<br>**A.M.**<br> *Plaintiffs*, <br>v.<br><br>**University of Maryland Medical System Corporation,**<br><br>    <u>**Serve**</u>:<br><br>    Adil A. Daudi<br>    250 West Pratt Street, 24th Floor<br>    Baltimore, MD 21201<br><br>and<br><br>**Baltimore Washington Medical Center, Inc.**,<br><br>    <u>**Serve**</u>:<br><br>    University of Maryland Medical System<br>    Corporation<br>    Office of the General Counsel<br>    250 West Pratt Street<br>    24th Floor<br>    Baltimore, MD<br><br> 21201 and<br><br>**Kathleen McCollum**, *in her official capacity as President and CEO of Baltimore Washington Medical Center, Inc.*,<br><br>    <u>**Serve**</u>:<br><br>    7 Ridge Road<br>    Severna Park, MD 21146<br><br>and | **CASE NO.: 1:23-cv-1684** |

**Thomas J. Cummings, Jr. M.D.**, *in his personal and official capacity as a medical professional at Baltimore Washington Medical Center, Inc.*

> <u>**Serve**</u>:
>
> 3060 16th Street, N.W., Apt. #303
> Washington, D.C. 20009

and

**Be-Live-It Therapy LLC** *trading as* **Family Intervention Partners**

> <u>**Serve**</u>:
>
> Becky Tatani
> 8301 Ashford Blvd #816
> Laurel, MD 20707

and

**Anne Arundel County** *operating as the* **Anne Arundel Crisis Intervention Team**

> <u>**Serve**</u>:
>
> Steuart Pittman, County Executive
> 44 Calvert Street
> Annapolis, MD 21401

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

Plaintiff T.M. was held against her will for over two months by Defendants Baltimore Washington Medical Center, Inc. ("BWMC" or the "Facility"), Thomas J. Cummings, Jr. M.D ("Cummings"), and Kathleen McCollum ("McCollum")(collectively the "Hospital Defendants"), neither because she was a criminal, nor because she was a prisoner, nor because she was psychotic, nor because she was a danger to herself or others. Instead, BWMC, Cummings, and McCollum— acting under the color of law in concert with one another and conspiring with each other against

2

T.M.—speculated that, should they release her from her involuntary detention, she would disregard her medications and wind up back in the hospital.  But such speculation was never a legitimate basis  for depriving T.M.'s liberties. To make matters worse, the Hospital Defendants actively sought to forcibly inject T.M. with highly potent antipsychotic medications against her will while holding her prisoner.  The Hospital Defendant's actions were  never sanctioned by law, and in fact, the law was "intended to put tight reins on the forced medication of involuntarily committed patients and not to allow the kind of regime portrayed in *One Flew Over The Cuckoo's Nest.*" *Mercer v. Thomas B. Fin. Ctr.*, 476  Md. 652, 265 A.3d 1044, 1071 (2021)(quoting *Md. Dep't of Health & Mental Hygiene v. Kelly*,  397 Md. 399, 447, 918 A.2d 470, 498–99 (2007)(Wilner, J., concurring)).

As proof that T.M. should be discharged, she hired an outside psychiatrist and  university professor Dr. Erik Messamore ("Dr. Messamore")[1] to conduct a May 24, 2023  evaluation (the "Evaluation") to opine whether T.M. was psychotic, whether she was a danger to  herself or others, and whether she required inpatient treatment.  That Evaluation was video recorded and is available here:  https://bit.ly/mancusot (the "Video").  As Dr. Messamore documented in his May 26, 2023 Report (the "Report"),[2] as is indisputable upon viewing the Video, T.M. was a woman who was not psychotic, did not require inpatient treatment, was not a danger to herself or others, and who clearly deserved to be free.  This is further borne out by the medical records, which also reflect that T.M. was not a danger to herself and others.

Under U.S. Supreme Court authorities and well-established constitutional principles, the Hospital Defendants were required to discharge T.M.  Involuntary "commitment to a mental hospital produces 'a massive curtailment of liberty,'" *Vitek v. Jones,* 445 U.S. 480, 491-92

---

[1] A true and correct copy of Dr. Messamore's CV is attached as **Exhibit 1**.
[2] A true and correct copy of the Messamore Report is attached as **Exhibit 2**.

(1980)(quoting *Humphrey v. Cady,* 405 U.S. 504, 509 (1972)), and in consequence "requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425 (1979). Indeed, a state actor cannot involuntarily hospitalize, or keep hospitalized, a non-dangerous individual capable of surviving safely in freedom by herself or with the help of willing and responsible family members or friends because, "even if [the] involuntary confinement was initially permissible, it could not constitutionally continue after that basis no longer existed." *O'Connor v. Donaldson*, 422 U.S. 563, 574–75 (1975).

No basis existed to continue T.M.'s imprisonment, yet the Hospital Defendants refused to release her from custody.  To secure her release from involuntary detention and to escape the imminent prospect of being forcibly injected with dangerous antipsychotic medications that presented a real possibility of serious, even fatal, side effects, T.M.—acting against her will and under duress—agreed to a "Consent Order" in the Circuit Court for Anne Arundel County, Maryland to resolve litigation that had been initiated to free T.M. and to vindicate the egregious violations of her constitutional rights. *See* **Exhibit 3.** The "Consent Order" not only conditioned T.M.'s freedom on her dismissal of all legal actions regarding her unlawful detention then pending, but also it imposes clearly unconstitutional limits on T.M.'s ability to control her own healthcare forever.

"No right is held more sacred, or is more carefully guarded," than "the right of every individual to the possession and control of [her] own person." *Union Pacific R. Co. v. Botsford,* 141 U. S. 250, 251 (1891); *see Cruzan v. Director, Mo. Dept. of Health,* 497 U. S. 261, 269 (1990)(It is fundamental that every adult "has a right to determine what shall be done with [her] own body"). The Constitution of the United States restricts the power of government to interfere with a person's medical decisions or compel her to undergo medical procedures or treatments. *See,*

*e.g., Winston v. Lee,* 470 U. S. 753, 766-767 (1985)(forced surgery); *Rochin v. California,* 342 U. S. 165, 166, 173-174 (1952)(forced stomach pumping); *Washington v. Harper,* 494 U. S. 210, 229, 236 (1990)(forced administration of antipsychotic drugs); *Vitek,* 445 U.S. at 492 (forced behavior modification treatment).   The "Consent Order" violates this most fundamental protection and purports to control in perpetuity the medical providers T.M. must use and the medical treatment regime she must accept.   The "Consent Order" also requires T.M.'s parents, who were not even parties in the lawsuit in which the order was entered, to perform certain actions regarding T.M.'s healthcare regardless of whether they believe such actions would be in T.M.'s best interests. This Action seeks relief in the form of a declaratory judgment that the "Consent Order" is invalid, unconstitutional, and unenforceable.   T.M. also seeks a preliminary and permanent injunction preventing all Defendants from seeking to enforce the "Consent Order."

## **INTRODUCTION**

1.     T.M., a college graduate, was until recently beholden to the whims of a medical provider who refused to acknowledge her autonomy and who deployed a strategy to keep her locked up, shadowing her with threats to forcibly inject her with potent antipsychotic medications.

2.     Not one reasonable person could have predicted this outcome—here was a young woman with no criminal history facing an indefinite detention after requesting a ***voluntary*** admission, which the facility, for whatever reason, denied.

3.     Rarely, if at all, does this occur, where a patient attempts to voluntarily admit herself, only for the provider—who must respect the rights and dignity of patients—to upend this request and immediately seek the indefinite involuntary detention of a non-criminal.

4.     As an involuntary admittee, T.M. was kept away from the outside world for over two months, cordoned off from the opportunity to leave her admission, even though the provider

5

could point to no recent episode that T.M. was a danger to herself or others.

5.      What's worse, notwithstanding her continuous compliance to orally ingest medications and her significant improvement, she faced yet another extraordinary prospect:   the forcible injection of antipsychotics against her will.

6.      As Courts recognize, the "forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty.  The interference is particularly severe when, as in this case, the medication in question is an antipsychotic, for the use of such medications threatens an individual's mental, as well as physical, integrity.  On the physical side, there is the violence inherent in forcible medication, compounded when it comes  to antipsychotics by the possibility of serious, even fatal, side effects.  But it is the invasion into a person's mental state that truly distinguishes antipsychotics, a class of medications expressly intended to alter the will and the mind of the subject."  *U.S. v. Watson*, 793 F.3d 416, 419 (4th Cir. 2015)(cleaned up and citations omitted).

7.      T.M.'s father, J.M., who previously had been appointed as T.M.'s Health Care Agent to make all medical decisions for T.M. in the event she could not do so for herself, and who expressly was granted the power and authority "to approve [T.M.'s] admission to or release from a psychiatric hospital or unit," attempted to intervene on T.M.'s behalf but the Hospital Defendants refused to recognize J.M. as T.M.'s lawfully designated healthcare agent and refused to release T.M. from custody.

8.      On April 20, 2023, J.M. sued the BWMC and its parent, the University of Maryland Medical System Corporation, to require them to recognize T.M.'s Advance Medical Directive and J.M.'s appointment as T.M.'s lawfully designated healthcare agent in *J.M. v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-000764 (Cir. Ct. A.A. County

2023).  The case was still pending when the "Consent Order" was entered on June 12, 2023.

9.     On May 3, 2023, T.M. filed a petition for judicial review of an ALJ decision authorizing the Hospital Defendants to involuntarily inject T.M. with psychiatric medications pursuant to Md. Health Gen. Code § 10-708 in *In re T.M.,* Case No. C-02-CV-23-000902 (Cir. Ct. A.A. County 2023).  The case was still pending when the "Consent Order" was entered on June 12, 2023.

10.    On May 5, 2023, T.M. filed a petition for writ of habeas corpus to remedy her unlawful detention in *T.M. v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-000910 (Cir. Ct. A.A. County 2023).  This is the underlying case in which the "Consent Order" was entered on June 12, 2023.

11.    On May 28, 2023, May 30, 2023, and June 6, 2023 T.M. filed emergency motions for judicial release in *T.M. v. Baltimore Washington Med. Ctr., et al.,* Case No. C-02-CV-23-001066 (Cir. Ct. A.A. County 2023).  The motion dated June 6, 2023 was still pending when the "Consent Order" was entered on June 12, 2023.

12.    On June 9, 2023, T.M. brought an action in the United States District Court for the District of Maryland under 42 U.S.C. § 1983 seeking damages for violations of her constitutional rights guaranteed by the Fourteenth Amendment of the U.S. Constitution and Article 24 of the Maryland Declaration of Rights in *T.M. v. University of Maryland Med. Sys. Corp., et. al.,* 1:23-cv-10572 (D. Md. 2023).  The case was still pending when the "Consent Order" was entered on June 12, 2023.

## JURISDICTION AND VENUE

13.    This action for declaratory and prospective injunctive relief is brought to address Defendants' ongoing deprivations of rights guaranteed by federal  statutes, the U.S. Constitution,

and the Maryland Declaration of Rights: the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1 (through 42 U.S.C. § 1983); and Article 24 of the Maryland Declaration of Rights.

14.     Plaintiff's claims for declaratory and injunctive relief are authorized by 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 & 2202 as well as by Rules 57 and 65 of the Federal Rules of Civil Procedure.

15.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(3) (civil rights jurisdiction).

16.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, and omissions giving rise to these claims occurred in this District.  All Defendants reside in this District, maintain places of business in this District, and/or conduct business in this District.

17.     For the same reasons, this Court may exercise personal jurisdiction over the Defendants.

## **PARTIES**

18.     Plaintiff T.M. is an adult person and citizen of the United States who resides in Maryland.

19.     Plaintiff A.M. is an adult person and citizen of the United States who resides in Maryland and is the mother of T.M.

20.     Plaintiff J.M. is an adult person and citizen of the United States who resides in Texas and is the father of T.M.

21.     Defendant UMMS is a "nonprofit, nonstock corporation" in the State of Maryland. Md. Code Ann. Educ. § 13-302(7).  UMMS was created by statute.  *See id.* § 13-301 *et seq.*  All

8

of the voting members of its Board of Directors are appointed by the Governor of Maryland. *Id.* § 13-304(b). According to its authorizing statute, UMMS is intended to serve "the highest public interest" and its purposes "are essential to the public health and welfare" of the State. *Id.* § 13-302(4). UMMS's offices are located at 250 W. Pratt St., Baltimore, Maryland 21201. UMMS accepts federal funds and is a state actor and "governmental entity, that is, an arm or instrumental of government for purposes of Plaintiff's assertion of . . . individual constitutional rights." *See Hammons v. Univ. of Md. Med. Sys. Corp.*, 551 F. Supp. 3d 567, 584 (D. Md. 2021); *accord Napata v. Univ. of Md. Med. Sys. Corp.*, 417 Md. 724, 737, 12 A.3d 144, 151 (2011); *see also Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 399 (1995) ("We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment.").

22.     Defendant Facility is a corporation organized under the laws of the State of Maryland, with its principal place of business located at 301 Hospital Drive, Glen Burnie, Maryland 21061. The Facility is a wholly owned subsidiary of UMMS and also accepts federal funds and is thus a state actor. *See Hammons v. Univ. of Md. Med. Sys. Corp.*, No. DKC 20-2088, 2023 WL 121741, at *16 (D. Md. Jan. 6, 2023).

23.     Defendant McCollum is a natural person who resides in Maryland and who serves as the President and Chief Executive Officer of the Facility. She is sued solely in her official capacity as President and CEO of a state actor.

24.     Defendant Cummings is a natural person who resides in Maryland and who is a medical professional of the Facility. He is sued solely in his official capacity as a medical professional acting on behalf of a state actor.

25.     Defendant Be-Live-It Therapy LLC is a Maryland Limited Liability Company formed under the laws of Maryland and conducts business in Maryland as "Family Intervention Partners," having its principal office located at 7207 Baltimore-Annapolis Blvd., Glen Burnie, MD 21061.  Under the "consent order," T.M. must accept Family Intervention Partners as one of her mental healthcare providers and must be seen at the practice "at least once every three (3) months" for the rest of her life.

26.     Defendant Anne Arundel Crisis Intervention Team is, upon information and belief, a component of the Anne Arundel County Police Department consisting of personnel and police officers who have received mental health training.  The Crisis Intervention Team is a local government entity operated by Anne Arundel County, Maryland.  Under the "consent order," T.M. must follow all recommendations made by the Crisis Intervention Team for the rest of her life.

## FACTUAL BACKGROUND

### I.   T.M.'s medical history and creation of the Advance Directive

27.     Since 2016, Dr. Heffner has been T.M.'s primary provider.  As noted in her CV, *see* **Exhibit 4**, Dr. Heffner was once a Medical Director at the Children's National Medical Center in Washington, D.C., and an Acting Medical Director at the Good Shepherd Center in Baltimore, Maryland.   Board Certified in General Psychiatry, Child and Adolescent  Psychiatry, and Integrative Pediatrics, Dr. Heffner has been honored by numerous awards, including an Albert Nelson Marquis 2020 Lifetime Achievement Award by *Marquis Who's Who* and 2020 Woman in Medicine Honoree by *America's Top Doctors*.

28.     Dr. Heffner has diagnosed T.M. with Hashimoto's Thyroiditis and Non-Celiac Gluten Sensitivity, which causes changes in T.M.'s mental status upon ingesting any amount of

gluten.  *See* **Exhibit 5 (**Dr. Heffner 6/16/2022 letter).

29.     Considering this diagnosis, Dr. Heffner has recommended that T.M. avoid gluten and,  when necessary, be prescribed Risperidone at a dose of 0.5 mg per day with a maximum dose of 0.75 mg as an effective treatment.  *Id.*

30.     Conversely, Dr. Heffner has advised ***against*** the use of high doses of antipsychotic medications because these often lead to extreme lethargy, akathisia, and extrapyramidal symptoms, such as cogwheel rigidity and tongue fasciculations.  *Id.*

31.     Furthermore, Dr. Heffner has advised ***against*** the use of Benzodiazepines  because of the fear of addiction and the risk of disinhibition and the loss of memory.  *Id.*

32.     A substantial body of medical literature supports Dr. Heffner's conclusion that T.M.'s episodes of psychosis "relates to a severe gluten sensitivity" triggered by her ingestion of gluten.  *See* **Exhibit 6 (**Dr. Heffner 5/5/2021 letter).

33.     Given these recommendations and out of concern for her treatment should a psychotic episode occur, T.M. created and executed her Advance Directive and Appointment of Healthcare Agent on July 19,  2022 (the "Advanced Directive").  *See* **Exhibit 7.**

34.     The purpose of the Advance Directive is to ensure that any health-care decision and treatment for T.M. is in accord with her wishes and desires, and in the event her wishes and desires are unknown, the agent selected by T.M. must act in good faith to proceed with T.M.'s best interests in mind.

35.     Recognizing that her father, J.M., has her best  interests in mind and is well-versed in her medical history and responses to past treatment, T.M. selected her father as her health-care agent.

36.     In selecting her father as her agent, T.M. understood that her father would

"review[] the benefits, burdens, risks that might result from a given treatment or course of treatment, or from the withholding or withdrawal or course of treatment" and then act in her best interests when selecting an appropriate health-care decision and treatment.

37.     The Advance Directive recognizes that, in the event T.M.'s wishes are not known, her father is in the best position to recognize what her wishes may be and he is authorized to make decisions on her behalf.

38.     Importantly, the Advance Directive explicitly grants J.M. "the power and authority to approve [T.M.'s] admission to or release from a psychiatric hospital or unit."

39.     Under the law, a provider must abide by the Advance Directive and treat a patient in accordance with the preferences set out in the Advance Directive or otherwise face possible criminal consequences. *See, e.g.*, Md. Code Ann. Health-Gen. § 10-701(c)(9); *id.* § 10-1003.

40.     Even the Facility's own website recognizes that "an Advance Directive is the best way to make sure everyone knows what you want."[3]

## II.  **Admission into the Facility and improper boarding in the emergency department**

41.     On March 23, 2023, T.M. had an unfortunate episode after accidentally  ingesting gluten, at which time she was taken to the Facility's emergency room.

42.     This triggered a state of psychosis, leading to agitation and aggression to the point that the police were called, who then had to escort T.M. to the Facility.

43.     Immediately, J.M. notified the Defendants about the Advance Directive and the need to confer with him in the event T.M. is unable to competently make any health-care decisions on her own behalf.

---

[3]     *See*   https://www.umms.org/bwmc/patients-visitors/for-patients/advance-directive-molst   (last accessed June 8, 2023).

44.     The Defendants were also aware of the Advance Directive because of T.M.'s past admissions to the Facility.

45.     Despite their knowledge of the Advance Directive, however, the Defendants have consistently declined to recognize the Advance Directive and the desires of T.M. in  contravention of the federal Patient Self-Determination Act and Maryland law, including, but not limited to Md. Health Gen. Code §§ 5-602.1, 10-701(c)(9), and 10-708.

46.     Indeed, Md. Health Gen. Code § 10-701(c)(9) mandates that a provider  must provide treatment "in accordance with the preferences in the advance directive."

47.     Taking matters into his own hands, Dr. Cummings refused and continues to refuse to acknowledge the Advance Directive despite his view that T.M. is incompetent because he is of the belief that J.M. has coerced T.M. into making certain  medical decisions.

48.     Nor, in compliance with the Patient Self-Determination Act and the Centers for Medicare and Medicaid Services' Conditions of Participation and Conditions of Coverage, has  Dr. Cummings provided notice of his objections to the Advance Directive and his rationale for doing so.

49.     Distrustful of T.M.'s parents, whom he blames for T.M.'s condition and readmission at the Facility, Dr. Cummings shielded T.M.'s family from any input  into T.M.'s treatment at the Facility.

50.     He has also obstructed T.M.'s parents from receiving critical information about T.M.'s treatment plan, including what medications he was administering to her.

51.     And because he placed zero weight on Dr. Heffner's diagnoses of T.M.,  Dr. Cummings did not take the necessary steps to rule out these diagnoses and consider alternative less intrusive treatment plans for T.M..

13

52.     Dr. Cummings refused to confer with Dr. Heffner to discuss T.M.'s medical history and appropriate treatment plan.

53.     Dr. Cummings' claim that the Advance Directive was legally deficient was simply a pretext by Dr. Cummings to avoid his legal duties to comply with a patient's Advance Directive and to punish T.M. and her family.

54.     Through Dr. Cummings, the Defendants blatantly disregarded T.M.'s rights under the law.

55.     For example, even though Md. Health Gen. Code § 10-624(b)(5) mandates that the Facility not keep T.M. in the "emergency facility for more than 30 hours," the Facility boarded her in the emergency department for eight (8) days.

56.     This is troubling because medical literature warns against the dangers of psychiatric boarding in emergency departments.

**III.     The Facility hastily seeks an involuntary admission of T.M.**

57.     At the outset of her initial appearance at the Facility, T.M. (either through herself or her father) consistently requested *voluntary* admission into the Facility.

58.     The Defendants—in an unusual step unheard of in these cases—ignored this request and immediately sought T.M.'s involuntary admission by scheduling an April 11, 2023 hearing before the Maryland Office of Administrative Hearings ("OAH").

59.     In doing so, the Defendants failed to provide the statutorily required notice to T.M. or alternatively J.M. (as her father and agent), who, because of the Defendants' actions and refusal to acknowledge the Advance Directive, was unable meaningfully to participate in the hearing on his daughter's behalf, unable to immediately engage counsel, unable to challenge the Defendants' contentions, unable to enter evidence into the record, unable to cross-examine the Defendants'

witnesses, and unable to offer his own witnesses, including Dr. Heffner, to corroborate the dangers of the very medications the Defendants were seeking to forcibly inject.

60.     Due process required, at a minimum, that T.M. be given an opportunity to prepare for and participate at a full and fair hearing under Maryland law and the Fourteenth Amendment.

61.     To make matters worse, even though the Facility failed to meet its burden under Md. Health Gen. Code §§ 10-617(a), 10-632(e)(2), and COMAR 10.21.01.09(F) to involuntarily admit T.M., Administrative Law Judge ("ALJ") Kristin Blumer somehow found in favor of the Facility on April 11, 2023. *See* **Exhibit 8**.

62.     In particular, the Facility was required to prove *by clear and convincing evidence* that T.M. is unable or unwilling to be voluntarily admitted to the Facility.

63.     Requests were made by both T.M. and her father that she be voluntarily admitted into the Facility.

64.     Despite these requests, the Facility (through Dr. Cummings's testimony) offered two reasons for denying T.M.'s and her father's clear requests to be voluntarily admitted. Dr. Cummings opined that, while simultaneously contradicting his attorney's argument that T.M. was competent, T.M. was "very, very impaired cognitively."[4]

65.     Next, when asked why he was unwilling to abide by T.M.'s father's request to voluntarily admit her under the Advance Directive, Dr. Cummings testified that her father was coercing her to request a voluntary admission: "And I think it's very important with any medical legal decision which is the standard in the field for an adult to be making their own decisions free of any coercion both from providers or clinical staff as well as from families or others."

66.     How Dr. Cummings could flout the law is beyond comprehension at this point:

---

[4] The 4/11/2023 ALJ hearing was recorded but has been transcribed only by T.M.'s prior law firm. The audio recording is available.

T.M. signed the Advance Directive for this very reason so that when she was found to be incompetent (which Dr. Cummings cannot dispute), the decision-making authority is vested with her father, whom T.M. has deemed as someone who knows her wishes and will have her best interests in mind, including the authority to approve T.M.'s admission to or release  from a psychiatric hospital or unit, such as the Facility.

67.     Dr. Cummings's personal opinion that J.M. was coercing his daughter had  no bearing on whether or not to abide by the Advance Directive.

68.     In fact, Dr. Cummings was never in a position to ascertain whether J.M. was exerting a coercive influence over his daughter, and even if J.M. were (and he was not), it is not Dr. Cummings's prerogative to make that determination, especially here where he has not provided any written notification of his objections to the Advance Directive and his rationale for doing so.

69.     Regardless of his personal opinions, the law commanded that he and the Defendants abide by the Advance Directive.

70.     It is clear that Dr. Cummings's *modus operandi* was in line with Professor Perlin's exclamation that expert witnesses, in mental-health settings, have a "high propensity to purposely distort their testimony in order to achieve desired ends."

71.     Throughout this testimony, he consistently contradicted himself and his own legal counsel and has been out of touch with the personnel at the Facility.

72.     For instance, even though his own statements in T.M.'s medical records  reflect his awareness that Dr. Heffner was T.M.'s current provider, Dr. Cummings  contradicted his own statements by testifying under oath during the April 11, 2023 hearing that he was "not fully aware of who [T.M.'s] most current treater would be.  The family has supplied letters of recommendations that are older in dating going back a number of years.  I do not know if anyone is currently treating

16

her."[5]

73.     Dr. Cummings testified as such to sweep under the rug his unwillingness to confer with Dr. Heffner in assessing T.M.'s diagnosis and considering less intrusive means to treat T.M..

74.     When Dr. Cummings finally recollected Dr. Heffner's name during his testimony, it became clear why he refuses to coordinate with her and T.M.'s family: he blames them for T.M.'s current disposition and gives no weight to the diagnoses of Hashimoto's Thyroiditis and Non-Celiac Gluten Sensitivity despite the qualifications of Dr. Heffner and the substantial medical literature supporting Dr. Heffner's conclusions. *See* **Exhibits 4 & 6**.

75.     But this is not a proper basis for a psychiatrist to disregard T.M.'s wishes and best interests, and reasonable medical judgment ordinarily considers the recommendations of a patient's family members and long-time treating providers.

76.     As detailed below, his own subjective findings recorded in T.M.'s medical records directly contradict the findings of not only Dr. Messamore and Dr. Heffner but also the Facility's own personnel, including another physician and the nurses.

77.     One clear example of this was Dr. Cummings's view that T.M. continued to present a danger to herself and others.  Despite his assessment, the medical records show that, between April 27, 2023 and June 5, 2023, T.M. had no instances of violence.  Indeed, under the Violence Checklist within the medical records, she had zero instances of confusion, irritability, boisterousness, verbal threats, physical threats, or attacking objects.

**IV.     Clinic Review Panel to approve the forcible injection of antipsychotics**

78.     After receiving ALJ Blumer's order to involuntarily admit T.M., UMMS, the

---

[5]  The family supplied letters referenced by Dr. Cummings in his testimony are from Dr. Heffner and are dated May 5, 2021 and June 16, 2022, *i.e.,* far from "going back a number of years."

Facility, and Dr. Cummings quickly scheduled a clinic review panel under Md. Health Gen. Code § 10-708 and obtained a panel order to forcibly inject T.M..

79.     By doing so, the Defendants moved forward against the recommendations of Dr. Heffner, who has consistently rejected the use of high dosages of antipsychotic medications by injection.

80.     To a maximum, Dr. Heffner proposed the use of Risperidone at 0.75 mg per day, but nothing more.

81.     T.M. immediately appealed the panel's order and eventually a hearing  before an ALJ was scheduled for April 25, 2023.

82.     Amid preparation for the April 25th hearing, T.M. notified the  Defendants of the witnesses she intended to present, including, but not limited to, Dr. Heffner and Dr. Messamore. *See* **Exhibit 9** (4/20/2023 witness designation letter).

83.     The Defendants had been aware of these witnesses since at least April 21, 2023,  if not longer.

84.     On April 21, 2023, the Defendants voluntarily withdrew their request for forcible injections (thereby cancelling the April 25th hearing) because "since the initial [clinical review panel], the patient has been taking medications."  *See* **Exhibit 10** (4/21/2023 Mohink email).

85.     While the news was welcomed, it was also disturbing because at no point had T.M. ever refused her medications to justify the initial panel review in the first place.

**V.** **Dr. Cummings attempts to inject T.M. then  immediately orders another clinical review panel**

86.     More troubling, even though T.M. continued to ingest her medications  and progress significantly, Dr. Cummings attempted to inject her on April 24, 2023 in violation  of Md.

Health Gen. Code § 10-708(b), which proscribes forcible injections until a clinical review  panel sanctions the request.

87.     Astonishingly, when T.M.'s counsel confronted Mr. Mohink, the Defendants' attorney about this attempt, Mr. Mohink denied this: "You have incorrect information.  There was no  attempt to medicate T.M. yesterday.  Perhaps your source of information should verify  the information before you make a significant allegation as you did." *See* **Exhibit 11** (4/25/2023 Mohink email).

88.     Testimony later confirmed, together with the medical records, that, indeed, Dr. Cummings did attempt to inject T.M. on April 24, 2023, and for several days thereafter on April 25 and April 26, and each  time, T.M. refused.

89.     Undeterred by T.M.'s refusal and despite her compliance to ingest her medications, Dr. Cummings immediately re-scheduled a clinical review panel even though not a week had passed since he had agreed to withdraw his original panel request and even though T.M. "has a significant constitutional liberty interest to be free from the *arbitrary* administration of antipsychotic drugs." *Mercer v. Thomas B. Finan Ctr.*, 476 Md. 652, 265 A.3d  1044, 1064, 1074 (2021) (emphasis in original; citation and internal quotation omitted).

90.     On April 26, 2023, Dr. Cummings notified T.M. that a panel would  convene the next day on April 27th at 3:45 p.m. to consider his request for the forcible injection  of Paliperidone palmitate (Invega Sustenna).  *See* **Exhibit 12** (4/26/2023 notice of CRP letter).

91.     As soon as T.M.'s counsel became aware of this panel, they immediately  provided notice to counsel (including Mr. Mohink) of T.M.'s witnesses—Dr.  Heffner, Dr. Richard Ratner ("Dr. Ratner"),[6] Dr. Messamore, and T.M.'s father—on  April 26, 2023 at 7:25 pm EST.    *See*

---

[6] Dr. Ratner's CV is attached as **Exhibit 13**.

**Exhibit 14** (4/26/2023 notice of witnesses letter).

92.     Not once did the Defendants consider the April 21st notice that T.M. had witnesses who were available to testify on her behalf, nor did they even consider accommodating their availability, instead resorting to an accelerated process at the arbitrary behest of Dr. Cummings.

93.     Given the exigent circumstances and because Defendants' counsel never responded to T.M.'s request for witnesses until 11:51 a.m. EST (not even four hours  before the scheduled panel hearing), T.M.'s attorney attempted to contact T.M.'s  statutorily mandated lay advisor to coordinate the presentation of T.M.'s witnesses.

94.     Under Md. Health Gen. Code § 10-708(e)(2), T.M. is entitled to "present information, including witnesses" and to "request assistance from a lay advisor."

95.     As defined by law, the "lay advisor" is "an individual at a facility, who is knowledgeable about mental health practice and who assists individuals with rights complaints." *Id.* at § 10-708(a)(2).  Before the panel can even reach a decision, it must "[r]eceive information presented by" T.M., including her witnesses. *Id.* at §§ 10-708(f)(3)(iii), (h)(1).

96.     The panel, by law, must also "[a]ssist [T.M.] and the treating physician to  arrive at a mutually agreeable treatment plan," "[r]eview[] the potential consequences of  requiring the administration of medication," and "may not approve the administration of  medication where alternative treatments are available and are acceptable to both the individual and the facility personnel who are directly responsible for implementing [T.M.'s]  treatment plan." Md. Health Gen. Code §§ 10-708(f)(2), (f)(3), (h)(3).

97.     Indeed, instead of permitting T.M. to coordinate the presentation of her  witnesses, the Defendants obstructed this right through their attorney Mr. Mohink, who, on April  27, 2023

(the day of the panel) at 11:51 a.m. EST, argued that T.M. has no "right to produce any witnesses other than her civil advocate." *See* **Exhibit 15** (4/27/2023 Mohink emails string).

98.     While Mr. Mohink reconsidered his position that same day at 1:25 p.m. EST, the damage was already done, with only two hours remaining until the panel. In his follow-up email, Mr. Mohink requested T.M.'s witnesses even though T.M. provided notice of her witnesses the prior evening and even though he was aware that T.M. had witnesses as of April 21, 2023 based on her prior expert disclosures. *See id.*

99.     Needless to say, T.M. did not have an adequate opportunity to notify her witnesses in time and, in fact, only two of her four witnesses were available for the medical panel at 3:45 p.m. EST. Both witnesses were also limited to ten minutes each.

100.    This coordination was made even more difficult by the fact that Mr. Mohink obstructed T.M.'s counsel's ability to speak directly with T.M.'s statutorily required lay advisor on the basis that the lay advisor was an employee by the Facility and was therefore represented by counsel. *See id.*

101.    Yet as the statute reads, the lay advisor is an individual who is to represent T.M. and would therefore be acting in her interests in advance of, during, and after the panel. Therefore, because T.M.'s interests are adverse to the Facility's, by right the lay advisor should and must have been independent. *Washington v. Harper*, 494 U.S. 210, 236 (1990).

102.    The Fourth Circuit has already admonished a lay advisor under similar circumstances for his "minimal participation during the administrative proceeding" and because his "participation at the hearing was limited." *U.S. v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999).

103.    This is precisely what happened to T.M.: she was assigned a lay advisor who did not have her best interests in mind and who minimally participated, if at all, at the clinical review

panel.

104.     Eventually, the panel affirmed Dr. Cummings's renewed request for forcible injection. *See* **Exhibit 16** (4/27/2023 CRP Decision).

105.     By making this decision, the panel concluded that T.M. objected to the medication even though she did not. *See* Md. Health Gen. Code §§ 10-708(a)(4), 10-708(b).

106.     Under the relevant statutory scheme, "medication" is defined simply as the "psychiatric medication prescribed for the treatment of a mental disorder." *Id.* § 10-708(a)(3). Significantly, that definition does not distinguish between the mechanisms by which a patient absorbs the medication.

107.     For weeks, T.M. had ingested the pill form of the medication that the Facility and Dr. Cummings sought to inject by force. Thus, she had not refused the medication; rather, she objected to the method of administration, *i.e.*, forcible injection against her will.

108.     Additionally, the panel inherently found T.M. to be at risk of being a danger to herself and others, but the panel would have been satisfied on the lone basis that she could not maintain her essential human needs of health or safety without forcible injections. **Exhibit 16** at 4 ("They (*sic*) will relapse into a condition in which the individual is unable to provide for the individual's essential human needs of health or safety.").

109.     Ironically, in deciding whether "other reasonable alternative treatments" had been considered, the panel recognized that T.M. "has been stabilizing (getting better) on oral paliperidone." *Id.* at 2.

110.     Despite T.M.'s cooperation and stabilization, astonishingly the panel agreed that the forcible injection of the *same* medication would somehow fare better. *Id.*

**VI.**   **Administrative Law Judge erroneously affirms panel finding**

111.   On April 27, 2023, T.M. appealed the panel's finding, triggering her right  to an appeal before an ALJ.

112.   Throughout the course of the May 2, 2023 hearing before ALJ Daniel Andrews, Dr. Cummings engaged in self-serving testimony that was contradictory, off base, and out of  touch with the realities of T.M.'s confinement.

113.   He continued to testify that T.M. presents herself as a danger to herself  and others, yet when ALJ Andrews inquired whether T.M. had engaged in any dangerous behavior within the past week, the only incident that Dr. Cummings could recall was  an incident over two weeks ago on April 16th, when T.M. allegedly verbally  threatened a staff member.

114.   How a verbal threat is tantamount to a dangerousness finding to support a forcible injection is constitutionally incomprehensible.

115.   Then, in reliance on mere speculation, Dr. Cummings justified his request on the basis  that T.M. may not continue orally ingesting her medications post-admission even though  she had cooperated for several weeks and even though she submitted testimony that she would abide by the instructions of her psychiatrist upon discharge.  *See* **Exhibit 17** (Statement regarding intent to comply with medical instructions).

116.   Dr. Cummings's rationale was without any basis: the injections that Dr. Cummings sought to use apparently last for thirty (30) days, and so presumably he would equally have to rely on T.M.'s willingness to return every thirty (30) days for the injections administered by  Dr. Cummings.

117.   Yet, by his logic, because he believes she was unwilling to orally ingest her medications, then surely he must believe that she was unwilling to return for forcible injections.

118.    And clearly, it cannot be the case that Dr. Cummings is allowed to indefinitely detain T.M. for the sole purpose of injecting her every thirty (30) days.

119.    Regardless, **Exhibit 17** demonstrated T.M.'s willingness to abide by the instructions of Dr. Heffner.

120.    Generalities such as Dr. Cummings's are not sufficient under the law. *See United States v. Bush*, 585 F.3d 806, 816 (4th Cir. 2009).

121.    Given that the Maryland legislature has made it crystal clear that forcible injection should be the last resort, *see Martin*, 114 Md. App. at 528, 691 A.2d at 256, Dr. Cummings's justifications should have failed to pass muster. *Accord U.S. v. Watson*, 793 F.3d 416, 419 (4th Cir. 2015) ("Forcible medication is not justified every time an incompetent defendant refuses treatment; on the contrary, 'those instances may be rare.'") (quoting *Sell v. United States*, 539 U.S. 166, 180 (2003)).

122.    Forcible medication is "a tool that must not be casually deployed," and courts must be vigilant to ensure that such orders, which "carry an unsavory pedigree," do not become "routine." *United States v. Chatmon*, 718 F.3d 369, 373–74 (4th Cir.2013).

123.    At any rate, it was not a permissible overriding interest to rely on a patient's length of stay as the basis for a forcible injection. *See, e.g.*, *Allmond v. Dep't of Health & Mental Hygiene*, 448 Md. 592, 618–19 (2016) (holding that an "interest in shortening the length of an individual's in-patient care . . . does not constitute an overriding justification . . . for the purpose of medicating an individual against the individual's will when the individual is not being held as a result of a criminal conviction.").

124.    The paradoxical testimony continued:  Dr. Cummings then justified his request for forcible injections on the basis that T.M. was unwilling to shower, as if hygiene should be the basis

to forcibly inject a patient.

125.    Astonishingly, the testimony was false:  as the nurse's notes in T.M.'s  medical records revealed, T.M. had recently showered, but Dr. Cummings danced  around the issue by stating (without any personal knowledge) that the nurse's note must be present only because T.M. asked the nurse for a shower.

126.    The medical records are clear: "Patient had her laundry done as requested, and also showered this shift," as noted by Nurse Jessica Dobbs on April 30, 2023.

127.    This myopic reading of the medical records is consistently borne out by Dr. Cummings's testimony, just as he previously testified during the April 11th hearing before ALJ Blumer that, despite what the medical records say, he had no knowledge of who T.M.'s current provider was.

128.    And yet despite these inconsistencies and insufficient testimony, despite the dangers laid out by Professor Perlin of the "high propensity [of expert witnesses] to purposely distort their testimony in order to achieve desired ends" and to "openly subvert statutory and case law criteria," ALJ Andrews found this testimony to be satisfactory and ruled in favor of the Facility by holding that, by the preponderance of the evidence, the Facility complied with the statutory mechanisms.  *See* **Exhibit 18** (5/2/2023 ALJ Decision).

129.    Disturbingly, recorded on the record but outside the hearing of the participants in the  proceedings, Dr. Andrews engaged in deliberations with other unidentified ALJs.  During this recorded conversation: (a) ALJ Andrews explicitly rejects "the way [Dr. Cummings] reviewed the record," which he found not to be persuasive; (b) ALJ Andrews blatantly calls into question the viability of forcible injections, which relies on T.M. agreeing to return to the facility  ("Who knows if she'll ever come back for follow-up?"); (c) it was discussed that "the family might need to be

committed as well" after Judge Andrews remarks that T.M.'s family's views on T.M.'s gluten sensitivity are "crazy"; and (d) the hospital is questioned "[w]hy are they pushing."[7]

130.   Even though ALJ Andrews, while deliberating with the unidentified ALJs, tilted against Dr. Cummings, finding his review of the record not to be persuasive and finding that it is not credible to suggest that T.M. will not be successful after discharge, all while an unidentified ALJ questioned "why [is the hospital] pushing," somehow ALJ Andrews found in favor of the Facility. The personal comments among the ALJs deriding and disparaging T.M.'s family, however—combined with ALJ Andrews's opinion of Dr. Cummings—create doubt that this was an impartial hearing.

**VII. Defendants abridge T.M.'s patient rights**

131.   Under the law, T.M. has certain liberty rights as a patient of the Facility.

132.   These rights are spelled out in the Maryland Department of Health and Mental Hygiene's Rights of Persons in Maryland's Psychiatric Facilities.

133.   One of these rights include visitation rights.  Under the law, T.M. "shall  be entitled to converse privately with and receive visits: . . . (3) During reasonable visiting hours  that the facility sets, from *any visitor if the individual wishes to see the visitor*."  Md. Health Gen. Code § 10-703(a)(3) (emphasis added).

134.   Only "for medically justified reasons" may the facility restrict a visit or private conversation and only if the restriction is documented and made part of the patient's medical records.  *Id.* § 10-703(c)(1).

135.   Both the Facility and UMMS understand that patients "can choose [their]  visitors," and that they cannot "restrict or deny visitation privileges based on race, religion, ethnicity, culture,

---

[7] The audio recording containing these comments is available.

national origin, language, age, sex, sexual orientation, gender identity or  expression, physical or

mental disability, or socio-economic status."

136.     In the event they do decide to restrict a visitor, the Facility and UMMS will

provide an "explanation if we restrict your visitors, mail or telephone calls."

137.     Despite these clearly delineated liberty rights, T.M. had restrictions placed on her

visitors.

138.     For example, on May 13, 2023, T.M. (through her attorney) requested  visitation

by video from Dr. Messamore on May 15, 2023.  On May 15, 2023, Mr.  Mohink denied this

request without any explanation, nor has an explanation been provided in  T.M.'s medical records.

139.     Only T.M.'s attorneys were permitted to visit T.M., and even still, they were

unable to speak with T.M. alone.

140.     The Defendants further obstructed T.M.'s parents' access to  information regarding

the treatment of T.M., including what medications Dr. Cummings  had administered to T.M..

**VIII.   Dr. Messamore's evaluation and T.M.'s status today**

141.     As of the date of this filing, T.M. is no longer in a state of psychosis.

142.     In accordance with the nurses' observations and as further proof that T.M. should

not have been held against her will is the latest finding by Dr. Messamore.  *See* **Exhibit  2**.

143.     Dr. Messamore recorded this evaluation by Video, which is  accessible at

https://bit.ly/mancusot.

144.     Dr. Messamore is a psychiatric physician, pharmacologist, and university

professor, and his specialties include the fields of psychopharmacology, complex mood  disorders,

psychosis, antipsychotic medication, and schizophrenia.  He currently serves as an Associate

Professor of Psychiatry at the Northeast Ohio Medical University ("NEOMED") in  Rootstown,

Ohio, and he is also the Medical Director of NEOMED's Best Practices in Schizophrenia Treatment Center.  *See* **Exhibit 1**.

145.    After evaluating T.M. on May 24, 2023 and analyzing the most-recent medical records available at the time between April 25, 2023 and May 23, 2023, Dr. Messamore reached the following conclusions:

1.    T.M. shows no evidence of psychosis at this time.

2.    T.M. shows no evidence of danger to herself at this time.

3.    T.M. shows no evidence of danger to others at this time.

4.    Although she has some sort of underlying illness that causes her to experience episodes of psychosis and cognitive impairment, symptoms of that condition are currently present to only a minimal or moderate degree.

5.    T.M. does not require inpatient treatment.

146.    Dr. Messamore frames his review of T.M.'s medical records by explaining the Facility's "Violence Checklist" assessments, which evaluate whether a patient is confused; irritable, boisterous, verbally threatening; physical threats; and attacking objects. *Id.* at 2.

147.    Notably, T.M. was evaluated 27 times between April 25, 2023 and May 22, 2023, and based on the "Violence Checklist," the only positive findings reflected in T.M.'s medical records were for "confusion" from over one month ago on April 25 and 26. *Id.*

148.    Next, Dr. Messamore summarizes four categories of findings based on the medical records: mental status, interest in self-care, willingness to take oral medication, and contrasting negative assessment.

149.    First, as to T.M.'s mental status, Dr. Messamore highlights several instances where the licensed clinical social worker Angela Egger ("Ms. Egger") noted that T.M. was

continually improving.   As Ms. Egger writes on May 8, 2023, "Patient continues to **show improvements in both mood and symptoms of psychosis**." *Id.* (emphasis added).  That same note summarizes how T.M. "was seen interacting with some peers and  engaging in treatment."

150.     Of significant import, as Ms. Egger states on May 1, 2023, T.M. "was **able to hold a logical conversation**" and expressed how she has "been able to write so much lately." *Id.* (emphasis added).

151.     Similarly, Ms. Egger previously wrote on April 28, 2023 that T.M. "has started journaling her ideas for different novels she would like to write [and . . .] was **able to discuss some of her ideas and appeared to enjoy engaging in a conversation.**" *Id.* at 3 (emphasis added).

152.     In fact, T.M. taught Ms. Egger how "to play a card game . . . in a logical fashion." *Id.*

*153.*     Next, Dr. Messamore directs the reader to examples in the medical records where T.M. has expressed an interest in self-care.[8]   For instance, on May 18, 2023, T.M. "verbalized she was happy to be able to shower and enjoy herself more." *Id.*  This  comports with Ms. Egger's note on May 1, 2023, where she draws attention to T.M.'s  much-improved hygiene, noting that T.M. "had allowed staff to attempt to comb her hair . . . and also showed some interest in starting to clean herself." *Id.*

154.     Further, Dr. Messamore's report identifies proof of T.M.'s willingness to  take oral medication.   In late April, T.M. "agreed that she feels better when she is on her  psychiatric medications."   In fact, on May 1, T.M. "continue[d] to voice a desire to  remain on her medication orally." *Id.*

---

[8] This is important because Dr. Cummings continuously cites T.M.'s hygiene as a basis  to detain her.  For instance, Dr. Cummings testified, without proof, that a hair bow had been stuck in T.M.'s hair for months.

155.    Finally, although there is a "striking discrepancy" between the nurses' notes and Dr. Cummings's notes, Dr. Cummings's most recent note from May 12, 2023 stated that T.M. "does not report current suicidal thoughts" and "denies current violent or homicidal ideation thoughts." Dr. Cummings also conceded that T.M. is in compliance with taking her medication, which was "generally good at this time." *Id.* at 3–4.

156.    To assess T.M.'s current mental status, Dr. Messamore opines on her general attitude, appearance, and behavior; speech; affect; thought process and content; and cognition.

157.    He describes that T.M.'s general attitude, appearance, and behavior was "pleasant and cooperating throughout the assessment" even though the assessment was lengthy. Dr. Messamore "pressed her for answers" and "challenged her firmly" and "touched painful memories from her past." Despite these "various significant stressors, [T.M.] did not become irritable, withdrawn, or inappropriately reactive." *Id.* at 4.

158.    Dr. Messamore opines that T.M.'s speech latency, speech value, and rate and prosody of her speech was normal. *Id*. at 5. Additionally, T.M. "had a restricted range of affect." *Id.*

159.    T.M.'s thought process was well organized and did not suggest a disordered thought process. Dr. Messamore "attempted to elicit psychotic ideas by conducting a lengthy interview, including stress-provoking themes, and introducing topics that often elicit psychotic ideas." *Id.*

160.    Despite Dr. Messamore's attempts, "[a]t no point did T.M. show any evidence of delusional thinking or hallucinations." Accordingly, T.M. showed "no evidence of psychosis" during the interview. *Id.*

161.    Dr. Messamore continues that T.M. did not express "thoughts suggestive of danger

to herself or others" and denied "thoughts of self-harm . . . and harming others." T.M. looked forward to going home and planned to work on her novels and join a soccer team. *Id.*

162.    Finally, while her memory appeared to be impaired "in a rather complex way" and her concentration was "mild to moderately impaired," Dr. Messamore concludes that T.M.'s ability to calculate is average, her fund of knowledge is average or better than  average, and her abstract reasoning ability is good. *Id.*

163.    Notably, T.M., over the course of this hour-long evaluation, was able to "correctly multiply 2 x 64 in her head," correctly estimated that "it's about 3,000 miles from  Maryland to California," could "recite the names of the last 5 presidents" of the United States, "correctly interprets the familiar proverb 'even monkeys fall from trees,'" "could recall 5 of 5  words after a lengthy period of distraction," and "correctly knew the date." *Id.* at 5–6.

164.    Dr. Messamore concludes his report with an analysis of whether T.M.  requires hospital care. Upon consideration of the medical records and his May 24, 2023  assessment of T.M., Dr. Messamore opines that "T.M.'s illness does not fulfill  criteria for inpatient care. *Id.* at 7.

165.    Dr. Messamore describes T.M.'s current symptom status as mild. Dr.  Messamore reasons that the Facility staff consistently described T.M. as a cooperative  young woman who would like to go home, work on a novel, and get a pet. Further, Dr.  Messamore did not "elicit any sign of psychosis, depression, mania, anxiety, or obsession." *Id.*

166.    T.M.'s status has improved so much that Dr. Messamore suspects that  "most physicians would not admit her to a hospital" even on a voluntary basis and he further  suspects that "most insurance companies would deny coverage for hospital care because there is  no evidence of suicidal thinking, no evidence of risk of self-harm, no evidence of danger to  others,

and no evidence of inability to attend to basic needs." This is especially so because T.M. has a "home she can return to, a parent to rely on for assistance, and an outpatient psychiatrist to continue her care." Indeed, "[b]ased on her current mental status, a person not aware of her past would probably not suspect her of having a mental illness." *Id.* at 7–8.

167.    These findings are on all fours with the previous findings of Dr. Ratner, who is a psychiatrist and forensic psychiatrist, who is currently a Clinical Professor of Psychiatry and Behavioral Sciences at the George Washington University School of Medicine and a Distinguished Life Fellow of the American Psychiatric Association, with nearly 50 years of practice and who was previously the President of the Washington, DC, Psychiatry Society and the American Society for Adolescent Psychiatry. *See* **Exhibit 13** (Dr. Ratner CV).

168.    Dr. Ratner personally observed T.M. on April 21, 2023 and May 1, 2023 and similarly concluded that there was no longer a basis to hold T.M. against her will, as noted in a May 8, 2023 letter. *See* **Exhibit 20** (Dr. Ratner 5/8/2023 letter).

169.    As of May 1, T.M. "no longer appeared actively psychotic." She was not "unruly, uncooperative nor unresponsive, and responded appropriately to the questions" Dr. Ratner had asked. *Id.*

170.    Dr. Ratner was asked whether there was any basis for maintaining T.M. on involuntary status at the time of his letter. He stated: "The answer is an unequivocal 'no.' She is voluntarily cooperating with her treatment program and seems competent to make treatment decisions for herself at this time." *Id.*

171.    Despite these expert views, Dr. Cummings was willing to say whatever was necessary to confine T.M., truth be damned. In fact, the mere existence of the Consent Order, which called for the release of T.M. in exchange for her dismissal of lawsuits and agreement to

follow a particular regime of medical care, demonstrates Dr. Cummings did not truly believe T.M. was psychotic or a danger to herself or others.

172.    As support for his rationale, Dr. Cummings completely disregarded his own nurse's observations, who—contrary to Dr. Cummings's findings—found T.M. to be agreeable and cooperative, compliant, engaging, logical, and willing to maintain her overall hygiene.

173.    And it was not beyond him to copy and paste his previous general subjective findings without any changes, which are generally devoid of any sort of conversational details or specific descriptions or examples of behaviors to support any of their generalizations or conclusions.

174.    In fact, Dr. Cummings did, at times, include his general observations for a particular day several weeks after that visit with T.M. occurred.

175.    This is especially illuminated by Dr. Cummings's "observations" of T.M. on the very same day that Dr. Messamore evaluated T.M. on May 24, 2023.  Despite the clear proof of the Video evaluation and Dr. Messamore's findings, Dr. Cummings still observed T.M. to be "with impaired communication, . . . with  impaired thinking and behavior," with responses to internal stimuli and auditory hallucinations,  with speech that is "not fully spontaneous, slow, halting rate, loud vol[ume] at times, [abnormal] rhythm and tone," with an "impaired, impoverished, disorganized" though process, with an "[u]nstable, restricted, odd, irritable" affect, and with a "poor" fund of knowledge (which he copied and pasted).

176.    Finally, as expressed by Dr. Heffner in a May 7, 2023 letter, because of being sexually assaulted in college, T.M. suffers from post-traumatic stress disorder ("PTSD"). Therefore, any attempt by the Defendants to forcibly inject T.M. with  antipsychotics would likely trigger and worsen T.M.'s PTSD.  *See* **Exhibit 20** (Dr. Heffner's 5/7/2023 letter).

177.    As Dr. Messamore notes, T.M. "has already experienced traumatizing loss of bodily autonomy.  Survey data reveals that involuntary hospitalization and forced medication are perceived as violating and traumatizing by a significant portion of psychiatric patients." *See* **Exhibit 2** at 6.

178.    Indeed, T.M. was helpless and at the mercy of Dr. Cummings.

179.    In conclusion, the foregoing demonstrates that T.M. found herself under the care of a provider who seemed determined to forcibly inject T.M. with antipsychotic drugs, who arbitrarily sought application for forcible injections—at one moment agreeing to cancel an injection request on the basis that T.M. was ingesting her medications and then a few days later reconvening the panel without coordinating with T.M.—and who was willing to rely on contradictory testimony sworn under penalty of perjury to get what he wanted.  Unfortunately, the medical ecosystem encouraging this behavior is made worse by a statutory regime that defers extraordinarily to providers like Dr. Cummings and the Defendants, who continuously flouted the law and T.M.'s due-process rights.

180.    But the legislative history of the statute demonstrates that the General Assembly "intended to put tight reins on the forced medication of involuntarily committed patients and not to allow the kind of regime portrayed in *One Flew Over The Cuckoo's Nest*."  *Mercer v. Thomas B. Fin. Ctr.*, 476 Md. 652, 265 A.3d 1044, 1071 (2021) (quoting *Kelly*, 397 Md. at 447, 918 A.2d at 498-99 (Wilner, J., concurring)).

### IX.  Having lost her legal challenge before the ALJ, and with no way out of custody and forcible injections against her will likely imminent, T.M. succumbs to a "Consent Order" under duress to gain her freedom and avoid the forced injections.

181.    T.M. and her attorneys faced a Hobson's choice: continue to pursue the legal appeals and federal lawsuit aimed at addressing the violations of T.M.'s rights under State law, the

Fourteenth Amendment of the U.S. Constitution and Article 24 of Maryland's Declaration of Rights while T.M. remained incarcerated and received antipsychotic drug injections against her will or negotiate a "Consent Order" to gain T.M.'s freedom and avoid for certain the forced injections.

182.    T.M., considering her own freedom and avoiding forced injections to be paramount to all else, agreed under duress to the "Consent Order" which represented the negotiated settlement agreement with the Hospital Defendants in the pending habeas case in Anne Arundel County.  *See* **Exhibit 3.**

183.    Under Maryland law, "a contract may be held void where, in addition to actual physical compulsion, a threat of imminent physical violence is exerted upon the victim of such magnitude as to cause a reasonable person, in the circumstances, to fear loss of life, or serious physical injury, or actual imprisonment for refusal to sign the document."  *United States use of Trane Co. v. Bond,* 332 Md. 170, 182-83, 586 A.2d 734, 740 (1991).

184.    "In other words, duress sufficient to render a contract void consists of the actual application of physical force that is sufficient to, and does, cause the person unwillingly to execute the document; as well as the threat of application of immediate physical force sufficient to place a person in the position of the signer in actual, reasonable, and imminent fear of death, serious personal injury, or actual imprisonment."  *Id.*; *Goel Servs. v. Kevin Dockett, Sr. Trucking, Inc.,* 2012 U.S. Dist. LEXIS 153560, *17-18, 2012 WL 5252057 (D. Md. Oct. 22, 2012)(same).

185.    The United States Supreme Court and the Fourth Circuit have both recognized that the antipsychotic drugs prescribed for T.M. by Dr. Cummings during her involuntary admission "can have serious, even fatal, side effects."  *Washington v. Harper,* 494 U.S. 210, 229 (1990); *United States v. Watson,* 793 F.3d 416, 419 (4th Cir. 2015).  Known side effects include "dystonia,

a severe involuntary spasm of the upper body, tongue, throat, or eyes, . . . akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, . . . a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face." *Harper,* 494 U.S. at 230.

186.    Because of the "Consent Order," T.M. is forced to continue to take the antipsychotic drug cocktails prescribed for her by Dr. Cummings—a medication regimen that is far different than that recommended by T.M.'s long-term treating psychiatrist Dr. Heffner, *see* **Exhibits 3, 5 & 6**, and which has caused and continues to cause T.M. to experience some of the side effects described in *Harper,* namely dystonia and akathesia.  *Id.*

187.    The conditions to which T.M. was forced to agree to obtain her freedom in the "Consent Order" are patently unconstitutional.  Under the 'consent order," T.M. **must**: (1) replace her long-term treating psychiatrist, Dr. Heffner, with another psychiatrist; (2) "continue to take the Invega (paliperidone) 6 mg in pill form daily that was prescribed while in the hospital," (3) use the services of Family Intervention Partners ("FIP") at least once every three months; (4) allow FIP and its providers to act as one of her mental health providers; (5) "instruct her [new] treating psychiatrist to consult with FIP regarding her treatment regime, including . . . prescribed medication;" (6) "follow all recommendations of her [new] treating psychiatrist regarding her treatment and medications/prescriptions;" (7) "accept referral to" and "follow" all "recommendations" made by "the Anne Arundel County Crisis Intervention Team;" (8) "take all prescribed medications that concern her psychiatric health;" and (9) "dismiss, with prejudice, all

pending actions against [the Defendants]."[9]  **Exhibit 3.**

188.    The "Consent Order" contains no time limitations and purports to control T.M.'s healthcare decisions, including the drugs she must take and the providers she must use in perpetuity. *Id.*

189.    Incredibly, the "Consent Order" also purports to bind T.M.'s parents, who were not parties to the habeas case in which the order was entered.  Under the "consent order," T.M.'s parents—J.M. and A.M.—**must**: (1) "remind, encourage, and monitor" T.M.'s "ingestion of her prescribed medications" and (2) "immediately notify FIP and the Anne Arundel Crisis Team if [T.M.] becomes non-compliant with her medication." *Id.*

190.    "[C]onsent decrees 'have attributes both of contracts and of judicial decrees,' a dual character that has resulted in different treatment for different purposes." *Local No. 93, Int. Assoc. of Firefighters v. Cleveland,* 478 U.S. 501, 519 (citing *United States v. ITT Continental Baking Co.,* 420 U.S. 233, 235-237, and n.10).  Unlike ordinary judicial orders, "the voluntary nature of a consent decree is its most fundamental characteristic."  *Id.* at 521-22.  "Indeed, it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all." *Id.* at 522 (citing *United States v. Ward Baking Co.,* 376 U.S. 327 (1964)(cannot enter consent decree to which one party has not consented)).

191.    In this case, T.M.'s agreement to the terms of the "Consent Order" was given under duress.  Had she not consented to the terms of the agreement, she would have continued to be incarcerated against her will and likely would have been forced to receive injections of

---

[9] In addition to these requirements, the Consent Order effectively restricts T.M.'s ability to travel, since she must visit FIP in Glen Burnie, Maryland at least once every quarter.  It also implicitly imposes upon T.M. an obligation to pay for the mandated medical services she is required to obtain under the Consent Order.

antipsychotic drugs against her will.

192.    The United States Supreme Court has recognized that, "although a State is not subject to suit without its consent there is always the right to enjoin an individual, whether he is a state officer or not, from doing an act [that] violat[es] the Constitution, . . ." *Missouri v. Chicago, B. & Q. R. Co.,* 241 U.S. 533, 537 (1916).

193.    Enforcement of the "Consent Order" in this case would require the State court to continue to deprive T.M. of her most fundamental right protected by the Fourteenth Amendment of the U.S. Constitution and by Article 24 of the Declaration of Rights to determine what shall be done with [her] own body. *Cruzan v. Director, Mo. Dept. of Health,* 497 U. S. 261, 269 (1990)(It is fundamental that every adult "has a right to determine what shall be done with [her] own body"); *see also Union Pacific R. Co. v. Botsford,* 141 U. S. 250, 251 (1891)("No right is held more sacred, or is more carefully guarded," than "the right of every individual to the possession and control of [her] own person.").

194.    The United States Constitution guarantees that state governments shall not "deprive any person of life, liberty, or property without due process of law," U.S. CONST,  amend. XIV § 1, and "forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores,* 507 U.S. 292, 301-302 (1993).

195.    Article 24 of the Maryland Declaration of Rights provides "[t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of  his peers, or by the Law of the land."

196.    This is the Maryland counterpart of the Due Process Clauses found in the Fifth and

38

Fourteenth Amendments to the United States Constitution. *Allmond v. DHMH*, 448 Md. 592, 608 (2016).

197.    Unless there is good reason to do otherwise, "state constitutional provisions [such as Article 24] are in *pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or generally should be interpreted in the same manner as federal provisions." *Dua v. Comcast Cable of Md., Inc.,* 370 Md. 604, 621, 805 A.2d 1061 (2002).

198.    "Article 24 of the Declaration of Rights and the Fifth and Fourteenth Amendments of the United States Constitution assure Maryland citizens of their rights to both procedural due process and substantive due process." *Johnson v. Md. Dep't of Health*, 470 Md. 648, 686 (2020).

199.    The Hospital Defendants, while acting under the color of law, deprived T.M. of her significant liberty rights without due process of law and continue to do so through the "Consent Order."

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

a)    Declare that the "Consent Order" violates the Maryland Declaration of Rights and the Due Process clause of the Fourteenth Amendment and is therefore unconstitutional, unenforceable, and void *ab initio*; and

b)    Declare further that the "Consent Order" is also void and unenforceable because it was obtained under duress while T.M. faced the prospect of further unlawful confinement and forced injections of antipsychotic drugs; and

c)    Grant preliminary and permanent injunctive relief preventing enforcement of the "Consent Order;" and

d)    Grant any other further relief that this Honorable Court deems to be just and

proper.

Dated: June 22, 2023                          Respectfully Submitted,

                                             /s/Ray M. Shepard_____
                                             Ray M. Shepard, Federal Bar No. 09473
                                             The Shepard Law Firm, LLC
                                             122 Riviera Drive
                                             Pasadena, Maryland 21122
                                             Phone: 410-255-0700
                                             Facsimile: 443-773-1922
                                             Email: Ray@Shepard.Law

                                             *Counsel for Plaintiffs T.M., J.M., and A.M.*